# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

| | |
|---|---|
| A BLUE IN COLOR ALCATEL FLIP PHONE BEARING IMEI: 014892005471176; AN APPLE IPHONE IN A BLACK IN COLOR OTTERBOX PHONE CASE BEARING IMEI: 354840090692774. | ) ) ) ) ) ) CASE NO. 3:19-MJ-1054 |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Matthew Ernst, being duly sworn, state the following information to be true to the best of my knowledge, information and belief:

## INTRODUCTION

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  As such, I am "an investigator or officer charged by the Attorney General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States" within the meaning of Section 3051(a) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, execute warrants and to make arrests for offenses against the United States and offenses enumerated in United States Code Title 18 and Title 21.  I have been employed with ATF since January 2015, and have been assigned to the Knoxville Field Office, under the Nashville Field Division.

2.      During my employment in law enforcement, I have received training in connection with, and conducted investigations of violations of the National Firearms Act, Gun Control Act, and Title 18, United States Code, Sections 922(g), 924(c) and others.  I have also

received training and conducted investigations involving illicit drugs and the distribution of illicit drugs in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846 and others.

3.      I am investigating Dominique MCKENZIE ("MCKENZIE"), aka "D-Paid," who is suspected of engaging in the business of importing, manufacturing, or dealing in firearms, in violation of Title 18, United States Code, Section 922(a)(1)(a); and acquiring a firearm from a Federal Firearms Licensee (FFL) through false statements, in violation of Title 18, United States Code, Section 922(a)(6).

4.      I am submitting this affidavit in support of an application for a warrant to search the following cellular telephones: A blue in color alcatel flip phone bearing IMEI: 014892005471176, as described in Attachment A (hereinafter "TARGET DEVICE A") and an Apple iPhone in a black in color Otterbox phone case bearing IMEI: 354840090692774, described in Attachment B (hereinafter "TARGET DEVICE B"). Both TARGET DEVCIE A and TARGET DEVICE B are presently being stored in secure law enforcement facility located at 710 Locust Street, Suite 514, Knoxville, TN 37902.

5.      Because this affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant authorizing the search of TARGET DEVICE A and TARGET DEVICE B, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish probable cause to believe that TARGET DEVICE A and TARGET DEVICE B contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 922, as further described in Attachment C.

## PROBABLE CAUSE

6. On February 6, 2019, I received information from the ATF's Nashville Intel Group of several suspicious purchases by MCKENZIE of semi-automatic firearms in the Eastern District of Tennessee, where he had mostly bought the same make, model and caliber firearm. MCKENZIE was also known to have a possible affiliation with the Crip's in Knoxville, TN. Based on my training and experience, this type of activity could be indicative of firearms trafficking. As such, we began to investigate MCKENZIE.

7. On February 11, 2019, I went to Shoot Point Blank, located at 620 Corporate Point Way, Knoxville, TN 37932, to obtain copies of the Firearms Transaction Record, ATF Form 4473 (hereinafter referred to as "ATF Form 4473"), that MCKENZIE filled out to purchase multiple firearms on January 20, January 21, and February 9, 2019. On February 14, 2019, I went to Smoky Mountain Guns and Ammo, located at 2320 Winfield Dunn Pkwy, Sevierville, TN 37876, to obtain copies of the ATF Form 4473's that MCKENZIE filled out to purchase firearms on October 18 (2 firearms), October 19, and November 21, 2018. For all ATF Form 4473s obtained from Shoot Point Blank and Smoky Mountain Guns and Ammo, MCKENZIE listed 4121 Deer Creek Drive, Knoxville, TN 37912 as being his address and that he was the "actual transferee/buyer of the firearm."

8. On February 18, 2019, MCKENZIE went to Crossroads Firearms, located at 5703 N. Broadway, Knoxville, Tennessee 37918, and filled out the ATF Form 4473, to purchase two Century Arms, Micro Draco, semi-automatic pistols. On the ATF Form 4473, MCKENZIE listed 4121 Deer Creek Drive, Knoxville, TN 37912 as being his address and he also indicated that he was the "actual transferee/buyer of the firearm." The ATF Form 4473, provides a warning that "You are not the actual transferee/buyer if you are acquiring the firearm on behalf

3

of another person." I observed MCKENZIE leave Crossroads Firearms carrying the two firearms, which were in two black-in-color boxes, and place the firearms in the rear passenger door of MCKENZIE'S 2012 silver Nissan Maxima bearing Tennessee License Plate Number 7N54W6.

9.     I, along with an officer with the Knoxville Police Department ("KPD"), conducted mobile surveillance of MCKENZIE leaving Crossroads Firearms. We witnessed MCKENZIE going directly to 4121 Deer Creek Drive, Knoxville, TN 37912. We also observed MCKENZIE parked in the driveway of the residence with the vehicle still running. We were unable to see whether MCKENZIE took the firearm into 4121 Deer Creek Drive, Knoxville, TN 37912. MCKENZIE stayed at the residence for approximately nine minutes before leaving. We were not able to maintain mobile surveillance of MCKENZIE after leaving the residence, due to the fact that MCKENZIE was traveling at a high rate of speed.

10.     On February 19, 2019, I went to Crossroads Firearms to retrieve the ATF Form 4473 filled out by MCKENZIE and was informed by an employee that MCKENZIE purchased the two Century Arms, Micro Draco, semi-automatic pistols from Black Market Arms LLC, located at 916 County Road 281, Auxvasse, MO 65231, and had the firearms transferred to Crossroads Firearms so that MCKENZIE could complete the purchase. An employee at Crossroads Firearms gave us the paperwork that was sent with the firearms from Black Market Arms, LLC, which details the transfer of the firearms from Black Market Arms, LLC to Crossroads Firearms, as well as listing MCKENZIE as the customer along with his phone number. I also reached out to Black Market Arms, LLC via electronic mail (e-mail) for further details of the purchase. Black Market Arms, LLC informed me that MCKENZIE purchased the firearms in his name, utilizing 4121 Deer Creek Drive, Knoxville, TN 37912 as his address. The

4

purchase of the firearms were accommodated through gunbroker.com and MCKENZIE utilized a credit card to complete the purchase.

11.    On February 21, 2019, an offline search of NCIC was conducted for all the firearms that MCKENZIE had purchased to date. The search revealed that on January 2, 2019, the KPD conducted a vehicle stop of a white Dodge Durango for speeding and window tint violations. The driver and sole occupant of the vehicle was Tevae Stewart ("STEWART"). As a result of the vehicle stop, KPD officers came into contact with two firearms that STEWART had in his possession. One of the firearms, a Glock, Model 27, .40 caliber pistol, serial number CBE163US, was purchased by MCKENZIE on November 21, 2018. This was verified by the ATF Form 4473 I received from Smoky Mountain Guns and Ammo on February 14, 2019. Law enforcement intelligence shows that STEWART is affiliated with gangs in the Knoxville, TN area.

12.    On February 22, 2019, I received KPD Incident Report #18-012892, which detailed the arrest of Stephon Matthews ("MATTHEWS") and Jerrell Davis ("DAVIS"), from April 1, 2018. Both MATTHEWS and DAVIS are members of the Rollin 60s Crip street gang in the Knoxville, Tennessee area. During that arrest, DAVIS was found to be in possession of approximately 55.74 grams of marijuana and an additional 48.73 grams of marijuana was recovered from the center console of MATTHEWS' vehicle. Also recovered from the vehicle was a Glock, Model 23, .40 caliber pistol, serial number MSH053. In a post arrest interview, MATTHEWS admitted to KPD officers that the firearm belonged to him and that MCKENZIE had purchased the firearm for him several months ago. MATTHEWS further stated that he needed the firearm for protection while traveling in the "eastside" of Knoxville, which based on

5

my experience, is a danger related to selling illegal narcotics and gang activity that MATTHEWS is involved in.

13.     On February 26, 2019, MCKENZIE went to Crossroads Firearms, located at 5703 N. Broadway, Knoxville, Tennessee 37918, and completed the purchase of a Glock, Model 27, semi-automatic pistol, bearing serial number KSX198, as well as buying ammunition and firearms parts/accessories. On the ATF Form 4473, MCKENZIE again provided his address as being 4121 Deer Creek Drive, Knoxville, TN 37912. On the ATF Form 4473, MCKENZIE again indicated that he was the "actual transferee/buyer of the firearm." After completing the purchase, I observed MCKENZIE leave the store carrying a white bag and entered the driver's side door of MCKENZIE'S silver Nissan.

14.     I, along with agents from the ATF Knoxville Field Office and KPD officers, established mobile surveillance of MCKENZIE leaving Crossroads Firearms. We witnessed MCKENZIE go directly to Applebee's Grill, located at 5316 Central Avenue Pike, Knoxville, Tennessee. After several minutes of MCKENZIE waiting inside his vehicle in the parking lot of Applebee's, we observed a 2010 Black Ford Taurus bearing Tennessee License Plate Number 6L18B6 pull into a parking spot next to where MCKENZIE was parked. The vehicle was registered to Lucky Ja Quan Clark ("CLARK"). CLARK is also affiliated with a street gang in the Knoxville, Tennessee area. We then observed MCKENZIE exit his vehicle, go to the driver side door of the black Ford Taurus, and hand a white bag to the driver, who matched CLARK'S physical description. After the transaction was complete, both MCKENZIE and CLARK leave the restaurant parking lot.

15.     On February 27, 2019, University of Tennessee Medical Center (UTMC) Police arrested CLARK on UTMC property for state firearm and narcotics charges. CLARK was

6

arrested for being in possession of the Glock, Model 27 that MCKENZIE had purchased on February 26, 2019, approximately .69 pounds of marijuana, a scale, a box of sandwich baggies, and several other items. Investigation further disclosed that CLARK was at UTMC to visit with STEWART who had been shot earlier that night in what is believed to be a gang related shooting. In a post arrest interview, CLARK stated that MCKENZIE had purchased the Glock, Model 27 for him.

16. On March 5, 2019, a state search warrant was obtained for the cellular telephone that CLARK was in possession of at the time of his arrest by UTMC Police on February 27, 2019. On March 11, 2019, I reviewed messages between CLARK and MCKENZIE regarding the purchase of the Glock, Model 27 on February 26, 2019 from Crossroads Firearms by MCKENZIE. The following conversation occurs between CLARK and MCKENZIE from February 20, 2019 to February 26, 2019:

> CLARK: Yo bro
>
> MCKENZIE: What it do
>
> CLARK: Wassup bro
>
> MCKENZIE: On the block chilln what it do
>
> CLARK: Shit im going to cali tonight i sold da otha tho
>
> CLARK: Ill b back Sunday ima hyu n give u da money to get me right
>
> MCKENZIE: Sayless I got you
>
> CLARK: Im back bro
>
> CLARK: How much u need
>
> MCKENZIE: What you want
>
> CLARK: Glock 23

7

CLARK: How much is dey

MCKENZIE: Brand new or used

CLARK: Either wats both

CLARK: Long as its clean idk

CLARK: I got 400 or do I need spend more

MCKENZIE: Gotta spend more than 4

CLARK: How much I aint trippn

MCKENZIE: Let me go gind one I'll let you no

MCKENZIE: Do you have cash app

CLARK: No do i need it

MCKENZIE: Gen4 Glock 23 500 plus tax

CLARK: Bet do dat

MCKENZIE: I might can get you a gen 5 Glock 23 for like 60 more

CLARK: Wats da difference

MCKENZIE: Gen 5 is the new glocks

CLARK: Just do gen 4

MCKENZIE: You do know you gotta pay me a lil fee

CLARK: How much i aint trippn bro

MCKENZIE: If you gotta a chick or a homie that's 21 and older you can send

them to the place and get it and don't have to pay a lil fee

CLARK: Ok bet bro

CLARK: Ill let u kno i ant trippn on giving u sumn for doing it tho

MCKENZIE: Ok I'll get it then

8

CLARK: How much was it in all plus da fee

CLARK: If i get da gen 4

MCKENZIE: Ima just charge ya 60. So 499 plus tax then my 60 gone be like 620

MCKENZIE: Smokey mountain might be cheaper. Call em for me and see how much they got Glock 23 for

CLARK: Ok

CLARK: Wats its called smoky mountain what

MCKENZIE: Smokey mountain gun and knife shop

CLARK: Wat time u get off

CLARK: N ill pay u

CLARK: *sends screenshot of google search for smokey mountain guns & knifes*

CLARK: This the place

MCKENZIE: Yes

MCKENZIE: Ok

MCKENZIE: It's gone be a lil extra cuz that's in Gatlinburg bt I got you

CLARK: I mighy have one ima hyu if i ont get it

CLARK: Hmu wen u get off

MCKENZIE: You get something

CLARK: Na get me one

MCKENZIE: Which one

CLARK: Glock 23

CLARK: U aint gotta go to da one i sent cuz dey close at 5

9

MCKENZIE: Da one for 500?? Wya

CLARK: Im at applebees

MCKENZIE: Might need to meet you or cash app

CLARK: By east town

MCKENZIE: Which Applebees

MCKENZIE: Cash app?

CLARK: Wya

MCKENZIE: Western

CLARK: I aint got cash app

MCKENZIE: Wya

CLARK: Esst in burlington

CLARK: Wya

MCKENZIE: Pull up to h block

MCKENZIE: Wya

MCKENZIE: Aye. I just thought about it. I can't make it to Smokey mountain. Ion get off work until 5. Will take bout a hr to get up there

CLARK: Ite bro

MCKENZIE: I can make it to broadway tho

MCKENZIE: It's up to you

MCKENZIE: I'm on my lunch break at work I can meet you if you wanna go

CLARK: Im at studio go for me ill come get it soon as I leave da stu

MCKENZIE: I can't have my phone at my job. I go back at 1. And I'll have my other break at 3

CLARK: Bet just hmu bout 3 ill meet u thete if u wabna do it like dat

CLARK: There

MCKENZIE: Ight ima send you my address

MCKENZIE: 7005 Middlebrook Pike, Knoxville, TN 37909 at 3

CLARK: Its wen u want me come there

MCKENZIE: Yea

CLARK: Or u wanna just meet at da da gun shop

MCKENZIE: Unless you can be here in 20 mins

CLARK: Na im at studio later

CLARK: I already gave u da money bro

MCKENZIE: Do you want that one at crossroads?

CLARK: Dats coo

MCKENZIE: Ima get da 27

CLARK: Ye get da 27 wit da extended clip n some hollow tipz

MCKENZIE: Man they said they sold that 27 bt they gotta another one 450 bt I gotta do another background check

CLARK: But ite

MCKENZIE: I'm here in the back. You. Will see my car

CLARK: Bet

MCKENZIE: Wya dude

CLARK: Pullin up

MCKENZIE: Ok

It is notable that in the conversation between CLARK and MCKENZIE, MCKENZIE tells CLARK that MCKENZIE charges a fee for purchasing the firearm for CLARK and that the fee is $60.

17.     I also reviewed several text message conversations on CLARK's cellular device regarding illegal narcotics sales. The messages show that CLARK is actively engaged in the sale/trafficking of illegal narcotics in the Eastern District of Tennessee.

18.     On March 29, 2019, MCKENZIE went to Shoot Point Blank, located at 620 Corporate Way, Knoxville, TN 37932 to purchase a Century Arms, Model Micro Draco, 7.62 x 39 caliber, semi-automatic pistol, bearing serial number PMD-10328-19. On the ATF Form 4473, MCKENZIE again provided his address as being 4121 Deer Creek Drive, Knoxville, TN 37912. On the ATF Form 4473, MCKENZIE again indicated that he was the "actual transferee/buyer of the firearm." MCKENZIE did not receive the firearm that day, because the background check from TBI was delayed. While at the store, MCKENZIE informed an employee of Shoot Point Blank that he was in possession of a bump stock. MCKENZIE told the employee the bump stock was legal because it was "grandfathered in." The employee informed MCKENZIE that all bump stocks were now illegal. Based on the current state of the law, the employee did provide MCKENZIE with accurate information.

19.     On March 30, 2019, MCKENZIE returned to Shoot Point Blank to complete the purchase. I, along with other members of law enforcement, observed MCKENZIE leave Shoot Point Blank and drive to various locations, one of which was 4121 Deer Creek Drive, Knoxville, TN 37912, before meeting an individual named Jeffrey Lee Schwartz ("SCHWARTZ") at the gas pumps of the Fresh Market and Deli at 2418 N. Central Street, Knoxville, TN 37917. Law enforcement witnessed MCKENZIE take a brown gun box from the rear passenger door of his

12

vehicle and hand it to SCHWARTZ. After the exchange, we performed a stop of SCHWARTZ's vehicle and questioned him about the gun purchase. SCHWARTZ stated he met MCKENZIE at a club and that he had given MCKENZIE approximately $850.00 to purchase the firearm for him. SCHWARTZ stated he was previously denied a firearm purchase at Smoky Mountain Guns and Ammo on March 28, 2019. SCHWARTZ stated he utilized various messaging applications on his cellular device to coordinate the purchase of the firearm with MCKENZIE. As officers were speaking with SCHWARTZ, MCKENZIE approached the officers. I, along with another ATF agent approached MCKENZIE and began questioning him. MCKENZIE stated he had come back to get his gun from SCHWARTZ. MCKENZIE stated he had bought the firearm that same day and gave it to SCHWARTZ to hold onto for him, while he did a couple of things because his house had been broken into recently. MCKENZIE handed me a receipt from Shoot Point Blank showing the purchase of the firearm for $829.36. MCKENZIE stated he did not sell the firearm to SCHWARTZ. I asked MCKENZIE if he had a bump stock. He stated he got rid of it on March 26th, which coincides with the date the law changed outlawing all bump stocks. MCKENZIE smirked when he made that statement. MCKENZIE stated that he resides at two residences, 4834 Scheel Road, Apartment #109, Knoxville, TN 37912 and 4121 Deer Creek Drive, Knoxville, TN 37912. MCKENZIE stated that Tennessee was a right to buy and sell state and he could sell as many firearms as he wanted. MCKENZIE gave us permission to search his vehicle. We searched the vehicle and found no evidence of gun trafficking. MCKENZIE's statement was inconsistent with the information we had obtained from SCHWARTZ.

20.     To date, ATF is aware of approximately 14 firearms that MCKENZIE has purchased from Federal Firearms Licensed (FFL) businesses and believe MCKENZIE could have purchased additional firearms from private individuals to be resold. These firearms have

13

been purchased from approximately October of 2018 to March 2019. All 14 firearms were semi-automatic pistols. Based on my training and experience individuals who purchase large quantities of firearms that are the same/similar in make, model or style is an indication of firearms trafficking. Furthermore, as detailed in this affidavit, MCKENZIE is a source of supply for firearms to gang members, associates of gang members and drug traffickers in the Knoxville, Tennessee area.

21.     On April 17, 2019, ATF executed a federal arrest warrant for MCKENZIE as well as a federal search warrant at 4834 Scheel Road, Apartment #109. Knoxville, TN 37912 and 4121 Deer Creek Drive, Knoxville, TN 37912 for evidence of firearms trafficking by MCKENZIE. This search warrant included authority to seize electronic devices of MCKENZIE to include cellular telephones. Agents observed MCKENZIE leaving his apartment, 4834 Scheel Road, Apartment #109, and MCKENZIE was taken into custody without incident. Search incident to arrest resulted in Agents recovering TARGET DEVICE A and TARGET DEVICE B from MCKENZIE'S person. As a result of the search warrants, Agents seized several items; however, Agents did not observe any of the firearms that MCKENZIE has purchased from FFL businesses in either residence.

22.     As previously mentioned, investigators know of at least four separate firearms, which have been found in possession of four separate individuals, all with gang affiliation, that have obtained those firearms from MCKENZIE.

23.     Based upon my training and experience, it is common for criminals to conceal evidence of unlawful activity within their cellular telephones. I know that criminals utilize cellular telephones to conduct their business and plan crimes; which in this case, is conducting straw purchases and firearms trafficking. I am also aware that cellular telephones provide

14

criminals with mobile access and control over their illegal trade. They often utilize cellular telephones to communicate with one another in furtherance of their activities. I know that cellular telephones frequently retain information for long periods of time, including retaining call histories, text messages, voicemail messages, photographs, internet history, GPS location and other information that can be retrieved from the cellular telephone even long after the cellular telephone ceased to be used. If unused and unaltered, like TARGET DEVICE A and TARGET DEVICE B, data can remain indefinitely. In addition, it is common for criminals to utilize multiple cellular telephones to further their ongoing criminal activity. Criminals utilize multiple cellular telephones to try to conceal their criminal activity or enterprise as a way to thwart law enforcement. In this case, we have evidence of firearms sales to MCKENZIE through FFL's for 14 semi-automatic pistols. We also know of at least two (2) instances where communication through cellular telephones were utilized to facilitate straw purchases of firearms by MCKENZIE. Cellular telephones are best analyzed in an offsite environment where the appropriate equipment can be used to download the data off the cellular telephone and preserve a copy of the downloaded material for inspection.

## Technical Terms

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the

15

phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

      b.     Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.   GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna

16

on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

25. Based on my training, experience, and research, I know that cellular devices such as either TARGET DEVICE, even flip phones, may have capabilities that frequently include **acting as a wireless telephone, digital camera, GPS navigation device, and PDA.** In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, evidence of a crime, or point toward the existence of evidence in other locations. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.

## Electronic Storage and Forensic Analysis

26. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

27. *Forensic evidence.* As further described in Attachment C, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the particular TARGET DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the particular TARGET DEVICE because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to

18

investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28. The nature of cellular phone-related evidence requires forensic analysts to employ a variety of different techniques to search for, document, and obtain electronic evidence. The search procedure may include the following techniques (the following is a nonexclusive list, as other search procedures may be used):

a. examination of all of the data contained in the cellular telephone, and/or memory storage devices in the cellular telephone to view the data and determine whether that data falls within the items to be seized as set forth herein;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

c. surveying various file directories and the individual files they contain;

d. opening files in order to determine their contents;

e. scanning storage areas;

19

f. performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear.

29. Because this warrant seeks only permission to examine only TARGET DEVICE A and TARGET DEVICE B, which are already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30. In light of the foregoing, there is probable cause to search TARGET DEVICE A and TARGET DEVICE B, as set forth in Attachment C, for evidence of firearms trafficking.

Respectfully submitted,

Matthew A. Ernst
Special Agent
ATF

Subscribed and sworn to before me on this 26th day of April, 2019

DEBRA C. POPLIN
United States Magistrate Judge

20

## ATTACHMENT A

A blue in color alcatel flip phone bearing IMEI: 014892005471176







**ATTACHMENT B**

Apple iPhone in a black in color Otterbox phone case bearing IMEI: 354840090692774









# ATTACHMENT C

1. All records on TARGET DEVICE A and TARGET DEVICE B described in Attachment A and B that relate to violations of Title 18, United States Code, Sections 922(a)(6) and 922(a)(1)(a) as follows:

   a. All communications, in whatever form, that relate to, further in any way, or constitute evidence of firearms trafficking and straw purchasing of firearms, including all records related to those communications.

   b. All photographs, videos, audio recordings, and text messages that relate to, further in any way, or constitute evidence of firearms trafficking or straw purchasing of firearms.

   c. All data, communications, information, and records, in whatever form, that have any tendency to establish the physical location of the particular TARGET DEVICE.

   d. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of MCKENZIE, or that of any of his associates involved in criminal activity.

   e. All data, communications, information, and records, in whatever form, that establish the identity or location of individuals facilitating firearms trafficking or straw purchasing of firearms.

2. Evidence of user attribution showing who used or owned the particular TARGET DEVICE at the time the electronically stored evidence described in this warrant was created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored.